[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
APRIL 20, 2012
JOHN LEY

————————————————

No. 09-15471

————————————————

D. C. Docket No. 06-01289-CV-JDW-AEP

ROBERT MORRIS,

Petitioner-Appellant,

versus

SECRETARY DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

(April 20, 2012)

Before EDMONDSON, BARKETT and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Robert Morris was convicted in 1999 of first-degree murder, burglary of a

dwelling, and robbery with a deadly weapon after the brutal killing of an 88-year-

old woman in her Lakeland, Florida apartment. He was sentenced to death. After direct appeal and postconviction proceedings in state court, Morris filed his federal habeas petition, raising fourteen claims of trial court error and ineffective assistance of counsel. The district court denied the petition on all claims.

We have before us on appeal four of these claims: (1) the alleged ineffective assistance of counsel in excluding Morris from an unrecorded bench conference during the penalty phase of his trial; (2) the alleged ineffective assistance of counsel for failing to advise Morris of his right to testify at the penalty phase or to call Morris to testify at the penalty phase; (3) an alleged trial court error in concluding that Morris's past drug use was "not mitigating"; and (4) cumulative error. After thorough review, we too conclude that Morris is not entitled to relief on any of these claims. Accordingly, we affirm the judgment of the district court and deny the petition.

## I.

### A.

The victim of this brutal murder, Violet Livingston, was 88 years old. Her body was found in her apartment by her son on the morning of September 2, 1994. When the police arrived, they found Livingston's body lying on the bedroom floor, with her head wrapped in bed sheets. The police found blood on the walls, some

furniture, and the victim's walking cane.

The medical examiner who performed the autopsy, Dr. Alexander Melamud, testified at trial that the victim died as a result of multiple injuries. In particular, Dr. Melamud testified that the victim suffered "multiple bruises, lacerations, abrasions, rib fractures, subarachnoid hemorrhage of the brain and mechanical asphyxia due to suffocation." Dr. Melamud could not determine the order in which the injuries were inflicted, but opined that the victim was alive for a short period after the attack began.

The State presented four main categories of evidence against Morris. First, the State's DNA experts testified that Morris could not be excluded as the source of DNA obtained from two locations on the victim's body and from the victim's kitchen curtain. One of the State's experts testified that the frequency of the tested DNA pattern in the African-American database would be 1 in 7.1 million. The expert testified that this number meant that the likelihood of obtaining the DNA profile from an African-American other than Morris was between 1 out of 710,000 and 1 out of 71 million. Second, the police obtained eleven fingerprints of value from the crime scene, and one of them, from a lightbulb outside of the victim's apartment, was matched to Morris. Third, the police found in and around Morris's residence items known to have belonged to the victim, including coin wrappers,

coin collection booklets, a coin sorter, and a small television. Finally, the State presented the testimony of Damion Sastre, who recounted a jailhouse confession to the murder by Morris. Sastre testified that Morris had told him about entering the victim's apartment, murdering the victim, and taking from the victim's apartment a small television, jewelry, old coins, and whatever money was around.

At the conclusion of the guilt phase, the jury convicted Morris of first-degree murder, armed burglary of a dwelling or battery committed during burglary of a dwelling, and robbery with a deadly weapon.

**B.**

Morris's claims on appeal all relate to the penalty phase of his trial. The penalty phase was conducted before the jury on March 8-11, 1999. At the penalty phase, the State recalled Dr. Melamud, who testified that the victim sustained at least thirty-one bruises, abrasions, and lacerations, including defensive wounds. He further opined that the injuries would have caused pain while the victim was conscious. The State also called as victim impact witnesses the victim's two sons and two of her grandchildren.

Morris presented eleven lay witnesses at the penalty phase. He called several family members and family friends to testify to the unfortunate circumstances of his childhood, including poverty, neglect, physical and emotional

4

abuse, and his mother's past substance abuse. The witnesses also testified about Morris's limited education, past drug use and addiction, and the positive role he has played in his family's life as an adult. Morris also called a clinical psychologist, Dr. Dee, who gave expert mental health testimony that Morris had a borderline to dull-normal IQ, that Morris developed an ulcer as a youth due to stress, and that Morris had abused drugs since childhood and was negatively affected by his troubled childhood. Although Morris testified at the guilt phase, he did not testify during the penalty phase.

At the conclusion of the penalty phase, the jury recommended death by a vote of 8 to 4. On April 30, 1999, the trial court sentenced Morris to death. The court found four aggravating factors, one statutory mitigating factor and numerous nonstatutory mitigating factors. The four aggravators were: (1) the crime was committed while Morris was on parole from a previous felony (robbery), Fla. Stat. § 921.141(5)(a), which the trial court accorded moderate weight; (2) Morris was previously convicted of a felony involving the use or threat of violence (robbery), id. § 921.141(5)(b), which the court accorded moderate weight; (3) the crime was committed for pecuniary gain, id. § 921.141(5)(f), which the court gave great weight; and (4) the crime was especially heinous, atrocious, or cruel, id. § 921.141(5)(h), which the court gave great weight.

5

The trial court also found the statutory mitigator that Morris had a substantially impaired capacity to conform his conduct to the requirements of law, id. § 921.141(6)(f), and gave this mitigator moderate weight. The court considered the following nonstatutory mitigators together: (1) Morris was born to a teenaged, unmarried mother; (2) Morris was physically and emotionally abused as a child; (3) Morris suffered neglect and physical deprivation as a child; (4) Morris's mother was a drug and alcohol abuser when Morris was a child; (5) Morris grew up in extreme poverty; (6) Morris witnessed the physical and sexual abuse of his mother and sisters; (7) Morris's father was absent for most of Morris's life; and (8) Morris's mother was arrested and had a criminal record while he was growing up. The court gave these mitigators great weight collectively.

The trial court also considered additional nonstatutory mitigators that it weighed individually. It considered the following characteristics regarding Morris: (1) borderline IQ (given little weight); (2) learning disabilities as a child (given little weight); (3) developed ulcers at a young age, reflecting extreme stress (given little weight); (4) use of alcohol and drugs at a young age and lifelong addiction problems (given little weight); (5) obtained high school diploma despite obstacles (given slight weight); (6) had loving protective relationships with family, including his daughter (given some weight); (7) adapts well to prison life (given little

weight); (8) can continue to support, encourage, and nurture his family while incarcerated (given some weight); (9) a life sentence is sufficient (little weight); and (10) courtroom demeanor was superb (given some weight).

Of particular relevance to this appeal is finding (4) in the individual nonstatutory mitigators. The extent of the trial court's discussion of Morris's past drug use in its sentencing order is found in a section labeled "The defendant began using alcohol and drugs at an early age, and developed a lifelong addiction problem," and reads as follows:

> Established and uncontroverted. That the defendant used drugs in the past is not mitigating. Moreover there is no evidence that he was using drugs in September, 1994 when he murdered Mrs. Livingston. This factor is entitled to little weight.

On February 21, 2002, the Florida Supreme Court affirmed Morris's conviction and sentence. Morris v. State, 811 So. 2d 661 (Fla. 2002) ("Morris I"). Morris raised five issues, one of which is his present claim that the trial court erred by not considering his past drug use as mitigating evidence. The Florida Supreme Court rejected this claim. Quoting the entirety of the trial court's discussion in the sentencing order, the Florida Supreme Court first noted that the trial court had found established and uncontroverted the fact that Morris had a lifelong addiction to drugs and alcohol. The Florida Supreme Court agreed with Morris that past

7

drug use and addiction are valid nonstatutory mitigators, and that the defendant need not be under the influence of drugs or alcohol at the time of the murder for this mitigating evidence to be weighed. Id. at 667 (citing Mahn v. State, 714 So. 2d 391, 401 (Fla. 1998)).

But the Florida Supreme Court then found that "[a]lthough the trial court's order on this point is confusing, it appears that the trial court did find and weigh the prior history of drug abuse and addiction." Id. (emphasis added). The Florida Supreme Court went on to further conclude that, "considering all of the other aggravation and mitigation in the case that the trial court evaluated, . . . any inaccuracy in the trial court's statements is harmless beyond a reasonable doubt." Id.

## C.

After his direct appeal, Morris pursued postconviction relief under Fla. R. Crim. P. 3.851. He filed his Second Amended 3.851 Motion on December 22, 2003. He raised eleven claims, including the two ineffective assistance of counsel claims and the cumulative error claim at issue in this appeal. Morris received both a Huff[1] hearing and an evidentiary hearing. After these hearings, the trial court

---

[1] See Huff v. State, 622 So. 2d 982, 983 (Fla. 1993) (holding that, because of the severity of punishment at issue in a death penalty postconviction case, the judge must allow the attorneys the opportunity to appear before the court and be heard on an initial postconviction motion).

denied postconviction relief. Morris then filed a state habeas petition. The Florida Supreme Court affirmed the denial of postconviction relief and rejected the state habeas claims in a unanimous opinion issued on April 20, 2006. Morris v. State, 931 So. 2d 821 (Fla. 2006) ("Morris II").

In addressing Morris's ineffective assistance of counsel claims, the Florida Supreme Court did not decide whether Morris had established deficient performance, instead concluding that Morris had failed to establish prejudice. Morris II, 931 So. 2d at 832, 834. As for Morris's absence from a bench conference during the penalty phase, the Florida Supreme Court first noted that it has repeatedly denied ineffective assistance claims regarding a defendant's absence from a bench conference "when the defendant has failed to show that anything was discussed at the conference that required the defendant's consultation." Id. at 832 (citing Orme v. State, 896 So. 2d 725, 738 (Fla. 2005); Vining v. State, 827 So. 2d 201, 218 (Fla. 2002); Hardwick v. Dugger, 648 So. 2d 100, 105 (Fla. 1994)). The Florida Supreme Court expressly tied this observation to the prejudice prong of the ineffective assistance of counsel test laid out in Strickland v. Washington, 466 U.S. 668 (1984), concluding:

> [E]ven if trial counsel was deficient in holding a bench conference with the trial judge outside of Morris's presence and without a waiver by him, Morris has not established that anything was discussed during this conference that required his consultation. Nor has he established

9

that the conference involved anything but purely legal matters to which his constitutional right to be present does not extend. Thus, we conclude that Morris has failed to demonstrate under Strickland that he was prejudiced by counsel's conduct.

Morris II, 931 So. 2d at 832.

As for Morris's claim that trial counsel was ineffective for failing to advise him of his constitutional right to testify at the penalty phase, the Florida Supreme Court first noted that defense counsel does have an obligation to inform the defendant of his right to testify. The Florida Supreme Court summed up the relevant testimony from Morris's postconviction evidentiary hearing this way:

> During the evidentiary hearing on this claim, trial counsel [Howard] Dimmig and Howardene Garrett testified that they had pretrial discussions with Morris concerning whether he would testify at trial. Dimmig testified that during these discussions he advised Morris of his right to testify but that he was unsure whether Morris understood that this meant he had a right to testify at both the guilt and penalty phases. Garrett was unable to recall whether she discussed with Morris his right to testify at the penalty phase of his trial. Morris testified at the evidentiary hearing that although he recalled Garrett asking him whether he wanted to testify during the guilt phase, neither Garrett nor Dimmig advised him of his right to testify in both phases of his trial.

Morris II, 931 So. 2d at 834.

The Florida Supreme Court did not parse this testimony to determine whether trial counsel's performance was deficient, instead again denying relief

10

under the prejudice prong of Strickland. Id. ("We need not determine whether there was deficient performance because we conclude that any failure to advise Morris that he had the right to testify during the penalty phase does not undermine our confidence in the death sentence and thus did not prejudice Morris."). The court noted that at the evidentiary hearing Morris did not dispute the testimony of the twelve witnesses who had testified on his behalf at the penalty phase, nor did he "offer any other evidence beyond that presented during the penalty phase." Id. Morris also testified at the evidentiary hearing that he would have reasserted his innocence claims during the penalty phase. The Florida Supreme Court stated that "[i]t is questionable whether the jury would have found Morris's testimony credible, especially as to his protestations of innocence." Id. It then concluded that, "[b]ased on Morris's diminished credibility and the fact that his testimony would have been cumulative to the extensive mitigation evidence presented at the penalty phase, . . . any failure by trial counsel to inform Morris of his right to testify in the penalty phase does not undermine this Court's confidence in the outcome of the trial." Id.

Having concluded that Morris had failed to establish that any of his claims had merit, the Florida Supreme Court determined that Morris's claim of cumulative error failed as well, and that Morris was not deprived of a fundamentally fair trial.

11

Id. at 837.

**D.**

Morris filed his federal habeas petition on July 12, 2006, in the United States District Court for the Middle District of Florida. His petition raised fourteen claims. After considering the state's response and Morris's reply, the district court entered an order and separate judgment on September 30, 2009, denying the petition as to each of the fourteen claims. Morris v. Sec'y, Dep't of Corr., 2009 WL 3170497 (M.D. Fla., Sept. 30, 2009).

As for Morris's ineffective assistance of counsel claim related to his absence from the unrecorded bench conference, the district court held that Morris had not met his burden of establishing that the Florida Supreme Court's prejudice determination was contrary to or an unreasonable application of Strickland. 2009 WL 3170497, at *11-12. The district court noted that Morris bore the burden of showing that his counsel was ineffective, and that his speculation about what might have been discussed during the bench conference was not sufficient to meet this burden. Id. at *12.

As for Morris's ineffective assistance claim concerning the failure of his trial counsel to advise him of his right to testify at the penalty phase, the district court agreed with the Florida Supreme Court's determination that Morris had failed to

12

establish prejudice under Strickland, and therefore Morris had not shown an entitlement to habeas relief under AEDPA. Id. at *15. After summarizing Morris's proposed testimony and the extensive mitigating testimony that actually was presented at the penalty phase, the district court concluded that "Morris' proposed testimony, in light of both parties' evidence, does not demonstrate a reasonable probability that his sentence would have been different had he testified during the penalty phase of the trial." Id. at *16. The district court expressly "agree[d] with the Florida Supreme Court's determination that Morris' proposed testimony would have essentially been nothing more than cumulative to the other witnesses' testimony." Id. "Moreover," the district court added, "to the extent Morris would have reasserted his innocence of the crimes, the jury clearly did not believe Morris because they had already found him guilty beyond a reasonable doubt." Id.

As for Morris's claim that the trial court erred by not considering his past drug use at sentencing, the district court "agree[d] with the Florida Supreme Court's conclusion that the trial judge did find and weigh the prior history of drug abuse and addiction." Id. at *28 (quotation omitted). The district court went on to note:

> Furthermore, even though the trial court stated "[t]hat the defendant used drugs in the past is not mitigating" (Id. [DE 23, Ex. A-36 at 96]),

13

the trial court nonetheless weighed the mitigating factor because it expressly found that "[t]his factor is entitled to little weight." (Id.) (emphasis added). Despite Morris' contentions, the state trial court did not reject Morris' history of drug and alcohol abuse as a mitigating factor. Rather, the court considered his history of drug and alcohol abuse and found that it was entitled to "little weight" because Morris was not under the influence of drugs at the time of the murder.

Id. at *28. Accordingly, the district court concluded that Morris "ha[d] not demonstrated that the Florida Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts." Id. at *29. The district court further concluded that Morris had failed to establish that any error on the trial court's part resulted in "actual prejudice." Id. at *29-30 (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). Finally, the district court summarily disposed of the cumulative error claim. Id. at *39 ("As all of Morris' individual claims are without merit, his cumulative error claim must fail.").

On November 23, 2009, the district court granted in part Morris's application for a Certificate of Appealability ("COA"), limited to Morris's claims that trial counsel was ineffective for failing to call Morris to testify in the penalty phase, and that the trial court erred in finding that Morris's past drug use was not mitigating. On August 25, 2010, this Court granted in part Morris's motion to expand the COA, adding the claim that trial counsel was ineffective for

14

participating in an unrecorded bench conference without obtaining a waiver of Morris's presence and the claim of cumulative error.

## II.

Because Morris filed his federal habeas petition after the 1996 effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, AEDPA governs the petition and the scope of our review. Penry v. Johnson, 532 U.S. 782, 792 (2001); Grossman v. McDonough, 466 F.3d 1325, 1335 (11th Cir. 2006). Under AEDPA, when the state court has adjudicated the petitioner's claim on the merits, a federal court may not grant habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). A state court's factual findings are presumed correct unless rebutted by clear and convincing evidence. Id. § 2254(e); Ferrell v. Hall, 640 F.3d 1199, 1223 (11th Cir. 2011).

AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 130 S. Ct. 1855, 1862 (2010) (internal quotation marks omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011) (internal quotation marks omitted). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer v. Andrade, 538 U.S. 63, 75 (2003) ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect or erroneous application of federal law.").

Finally, we review de novo the district court's resolution of questions of law or mixed questions of law and fact. See Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1177 (11th Cir. 2010); Fotopoulos v. Sec'y, Dep't of Corr., 516 F.3d 1229, 1232 (11th Cir. 2008). We review factual findings made by the district court for clear error. Spencer, 609 F.3d at 1177.

## A.

Morris first claims that his trial counsel was ineffective in excluding him from a bench conference without a waiver. To succeed on an ineffective assistance

16

claim, Morris must show both deficient performance and prejudice: he must establish both that "counsel's representation fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694; accord Wiggins v. Smith, 539 U.S. 510, 521-22 (2003); Darden v. Wainwright, 477 U.S. 168, 184 (1986). The Supreme Court also made clear in Strickland that a court need not address both prongs if the petitioner has made an insufficient showing on one of them, and that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Strickland, 466 U.S. at 697; accord Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("[T]he court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." (citation omitted)).

Furthermore, as a federal habeas court we are not applying Strickland de novo, but rather through the additional prism of AEDPA deference.[2] 28 U.S.C. § 2254(d)(1). Thus, under this doubly deferential standard, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable."

---

[2] This is true as to the prejudice prong of Strickland, which the Florida Supreme Court unquestionably adjudicated on the merits for both of Morris's ineffective assistance of counsel claims. Morris II, 931 So. 2d at 832, 834.

17

Harrington, 131 S. Ct. at 785 ("A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself."). And if, at a minimum, fairminded jurists could disagree about the correctness of the state court's decision, the state court's application of Strickland was not unreasonable and AEDPA precludes the grant of habeas relief. Id. at 786.

The Supreme Court has made clear that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." Kentucky v. Stincer, 482 U.S. 730, 745 (1987); see Illinois v. Allen, 397 U.S. 337, 338 (1970). In Stincer, the Court noted that "due process clearly requires that a defendant be allowed to be present 'to the extent that a fair and just hearing would be thwarted by his absence.'" 482 U.S. at 745 (quoting Snyder v. Massachusetts, 291 U.S. 97, 108 (1934)).

The Florida Supreme Court did not address whether counsel's performance was deficient, instead determining that Morris had failed to meet his burden of establishing prejudice under Strickland. Morris II, 931 So. 2d at 832. We take the same approach, and hold that under the circumstances presented here, the Florida Supreme Court's determination that Morris failed to establish prejudice under

Strickland was not unreasonable.  Morris has failed to establish that there is a reasonable probability that, but for his trial counsel excluding him from the bench conference, the result of the proceedings would have been different, let alone that the Florida Supreme Court's determination on this point was an unreasonable application of clearly established Supreme Court law.  Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.

The bench conference at issue took place during the penalty phase of the trial.  Morris's trial counsel, Mr. Dimmig and Ms. Garrett, were present, as was the prosecutor Mr. Harb.  The conference took place at the very beginning of the day, before the jury had entered the courtroom.  Defense counsel brought to the trial court's attention that one of the sets of Morris's fingerprints that had been published to the jury the day before was taken from an unrelated arrest and had a note on the back indicating that the arrest was for the felonious possession of a controlled substance.  The court agreed that the set of fingerprints that made reference to the prior arrest should be removed, and discussed with the lawyers how the State's exhibits would be marked.  At that point, the following colloquy took place just before and after the unrecorded bench conference:

> THE COURT:      Anything else?
> MR. DIMMIG:     Yes, Your Honor.  At this time based on --

19

| | |
|---|---|
| MR. HARB: | We need your client here. |
| MR. DIMMIG: | Yeah. We would need him in here. |
| MS. GARRETT: | I had one other thing before we go on to that I had one other thing I wanted to bring up that I prefer to bring up outside my client's presence. It doesn't even have to be on the record. |

(Discussion off the record.)

(The defendant entered the courtroom.)

| | |
|---|---|
| MR. DIMMIG: | Your Honor, at this time the defense would make a Motion for Mistrial based upon the erroneous publication to this jury of what has now been marked as State's Exhibit A-1. That is a fingerprint card which reflects that Mr. Morris was booked into a Missouri jail on the charges of felonious possession of illegal narcotics and what appears to be a burglary, though it is abbreviated in some fashion. |

At Morris's state postconviction evidentiary hearing, Ms. Garrett testified that she had no independent recollection of the bench conference, or of the substance of what was discussed at the bench conference. She further testified that she did not believe that she would have excluded Morris from a bench conference at which he needed to be present, and the fact that there was no reconstruction of the bench conference on the record led her to believe that the matter was not a consequential one.

The Florida Supreme Court implicitly credited Ms. Garrett's testimony, especially in the absence of any contrary showing by Morris. It found that "Morris

20

has not established that anything was discussed during this conference that required his consultation. Nor has he established that the conference involved anything but purely legal matters to which his constitutional right to be present does not extend." Morris II, 931 So. 2d at 832. Accordingly, the Florida Supreme Court held that Morris's absence from the bench conference did not undermine its confidence in the outcome of the penalty phase proceedings, and therefore Morris failed to demonstrate prejudice under Strickland.

Nevertheless, Morris, relying on Arizona v. Fulminante, 499 U.S. 279, 309-10 (1991), claims that the Florida Supreme Court "could not know whether the discussions at the bench were or were not related to legal matters pertaining to Mr. Morris's trial," and that his absence was a structural error that "affected the framework within which the trial proceeded." But in Fulminante, the Supreme Court was discussing a very limited category of constitutional errors -- such as "the total deprivation of the right to counsel at trial" or "a judge who was not impartial" -- that are "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless error' standards." Id. The absence of a defendant from a single bench conference is not the type of fundamental error that infects "[t]he entire conduct of the trial from beginning to end." Id. at 309. Still another problem with Morris's claim, with respect to establishing prejudice under

21

Strickland, is that it simply assumes that something of critical import was discussed at the bench conference without ever advancing any theory of what it might have been or why that was the case. Without Morris even attempting to articulate what might have been discussed at the bench conference, we cannot conclude that he has met his burden of establishing a reasonable probability that but for trial counsel's purported error in excluding him from the conference, the result of the penalty phase proceedings would have been different, let alone that the Florida Supreme Court's determination was an unreasonable one.

Moreover, the colloquy on the record and the surrounding context suggest that trial counsel were well aware of Morris's right to be present. Defense counsel were about to move for a mistrial based on the erroneous publication of a fingerprint card, but stopped when they realized -- after the prosecutor chimed in -- that Morris needed to be there. Trial counsel Garrett then brought up a seemingly unrelated matter with the trial court, and the bench conference was conducted off the record, without any objection from the prosecutor. Once they went back on the record and the defendant entered the courtroom, the defense then moved for the mistrial based on what the parties had been discussing prior to the bench conference. Nothing about this course of events even remotely suggests that Morris's absence from the bench conference had any effect on the outcome of the

22

penalty phase.

We acknowledge that Morris faces a significant burden in demonstrating prejudice under these circumstances. He was not present at the bench conference, the conference was off the record, and his trial counsel Garrett testified during postconviction proceedings that she could not remember what was discussed. In that situation, it is a tall order indeed for Morris to demonstrate that his absence from the conference resulted in prejudice under Strickland. Nonetheless, the law is clear that Morris bears this burden. See Strickland, 466 U.S. at 687 ("[T]he defendant must show that the deficient performance prejudiced the defense."); Johnson v. Alabama, 256 F.3d 1156, 1176 (11th Cir. 2001) ("The petitioner bears the burden of proof on the 'performance' prong as well as the 'prejudice' prong of a Strickland claim, and both prongs must be proved to prevail.").

In short, Morris has failed to establish that the Florida Supreme Court's decision on this claim was either contrary to or an unreasonable application of Strickland, and we accordingly deny relief. In so holding, we emphasize that we do not condone the conduct of the state trial court, especially in light of the grave stakes inherent in capital litigation. When a trial court conducts any proceedings off the record, it unnecessarily renders much more difficult a reviewing court's task of ensuring that the defendant received a fair trial. But difficult is not

23

impossible, and Morris has not provided anything that would permit us to grant habeas relief on his first Strickland claim.

**B.**

Morris's second Strickland claim is that his trial counsel was ineffective for failing to advise him of his right to testify during the penalty phase. This Court, relying on the Supreme Court's decision in Rock v. Arkansas, 483 U.S. 44 (1987), has recognized that "a criminal defendant has a fundamental constitutional right to testify in his or her own behalf at trial" under several provisions of the Constitution, including the Sixth and Fourteenth Amendments. United States v. Teague, 953 F.2d 1525, 1530-32 (11th Cir. 1992) (en banc) (emphasis omitted). "This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel." Id. at 1532. "Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide. This advice is crucial because there can be no effective waiver of a fundamental constitutional right unless there is an 'intentional relinquishment or abandonment of a known right of privilege.'" Id. at 1533 (footnote omitted) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). Where defense counsel has not informed the defendant of his right to testify, defense counsel "has not acted

24

within the range of competence demanded of attorney[s] in criminal cases."
Gallego v. U.S., 174 F.3d 1196, 1197 (11th Cir. 1999) (citation and internal quotation marks omitted); see Teague, 953 F.2d at 1534.

Here, the record is unclear as to whether Morris's trial counsel properly advised him of his right to testify during the penalty phase. As with the first Strickland claim, the Florida Supreme Court did not determine whether there was deficient performance, and instead went straight to the prejudice prong and concluded that Morris had failed to meet his burden of establishing prejudice. Morris II, 931 So. 2d at 834. We, again, take the same approach. Morris's ineffective assistance of counsel claim fails because he has not established that the Florida Supreme Court's prejudice determination was an unreasonable application of Strickland.

During the penalty phase, Morris's trial counsel presented substantial mitigating evidence on his behalf, including testimony from twelve witnesses. Much of the testimony focused on Morris's severely troubled childhood. For example, Morris's mother Linda Bell and sister Paula Howard testified regarding the rape of four-year-old Howard when Morris was five years old, and that Morris was angry and upset about not being able to protect his sister. Morris's mother and sister also testified that Morris's mother's boyfriend, a man named Santee,

frequently beat Morris's mother, made the children watch him beat their mother, and also beat Morris when Morris tried to help his mother during the beatings. Morris's other sister, Sharon Watson, further testified that the children saw Santee beat their mother with a wire hanger and that he threatened Morris's mother with a knife. Morris's mother also testified that Morris would steal as a child, and that they had been arrested together for shoplifting. A friend of Morris's mother, Mandy Candie, testified that Morris's mother encouraged Morris to steal for her.

Morris also presented expert health testimony from Dr. Dee, a clinical psychologist and neuropsychologist. Dr. Dee testified that Morris witnessed and experienced "savage" abuse as a child. Dr. Dee testified that Morris would steal as a child to obtain his mother's approval. Dr. Dee also testified at length regarding Morris's and Morris's mother's abuse of drugs, Morris's development of an ulcer when he was a child, and Morris's low IQ level.

Morris does not dispute the contents of the testimony offered on his behalf at the penalty phase. Notably, at the postconviction evidentiary hearing, Morris did not offer additional testimony beyond what was already presented. When asked on direct examination what his testimony would have been at the penalty phase, he responded that "I would have answered whatever questions they asked me." Morris also stated at the evidentiary hearing that he would have testified as to his

upbringing, how he felt when his mother made him steal, and how he came to be diagnosed with ulcers. Morris also suggested that he would have reaffirmed his innocence: when asked on cross-examination whether he would "still have denied that [he] killed Mrs. Livingston" in his penalty phase testimony, Morris replied, "I didn't do it." Morris's arguments in his habeas petition are similar. He states that he would have described the abuse he and his family suffered because of his mother's boyfriend, that he would have discussed how his mother forced him to shoplift, that he could have clarified his vocational training, and that he could have described "the numerous factors in his background that would mitigate against the imposition of the sentence of death." In his brief, Morris again argues that he "suffered prejudice because the jury did not hear him describe, in his own words, the abuse and trauma suffered as a child."

In light of the unrebutted factfinding by the Florida Supreme Court that Morris would not have been credible in reasserting his innocence and that his proposed testimony would have been cumulative, Morris II, 931 So. 2d at 834, the Florida Supreme Court's determination that any failure by trial counsel to inform Morris of his right to testify did not undermine its confidence in the outcome of the penalty phase was not an unreasonable one. See Wong v. Belmontes, 130 S. Ct. 383, 388 (2009) (per curiam) (rejecting the argument that petitioner established

Strickland prejudice when the additional mitigating evidence that counsel failed to introduce was cumulative with the substantial mitigation evidence that had been presented to the jury); Stewart v. Dugger, 877 F.2d 851, 856 (11th Cir. 1989) (observing that additional character witnesses "would not have had an effect on [the jury's] verdict" because "[s]uch testimony would have merely been cumulative"). Moreover, to the extent Morris planned to reassert his innocence at the penalty phase, the testimony would not have helped him, because the same jury had already found Morris guilty of the murder. Indeed, this testimony likely would have harmed Morris's penalty phase defense. In short, Morris has not demonstrated a reasonable probability that his sentence would have been different had he testified during the penalty phase of the trial, much less that the Florida Supreme Court's contrary conclusion was an unreasonable one. Accordingly, we deny Morris relief on his second Strickland claim.

## C.

Morris's next claim is that the state trial court erred in failing to consider his history of illegal drug use as a nonstatutory mitigating factor in its sentencing order, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. Morris relies on Lockett v. Ohio, 438 U.S. 586 (1978), and its progeny for the now well-established proposition that the sentencer in a capital case must consider any

28

relevant mitigating evidence. Id. at 608; Eddings v. Oklahoma, 455 U.S. 104, 113-14 (1982) ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence."); see also Glock v. Moore, 195 F.3d 625, 637 n.20 (11th Cir. 1999).

The operative word, however, is "consider." The Supreme Court has made clear that the sentencer need not accept or ascribe any specific weight to the evidence that it considers. "Acceptance of nonstatutory mitigating factors is not constitutionally required; the Constitution only requires that the sentencer consider the factors." Atkins v. Singletary, 965 F.2d 952, 962 (11th Cir. 1992) (citing Blystone v. Pennsylvania, 494 U.S. 299, 308 (1990)); accord Harris v. Alabama, 513 U.S. 504, 512 (1995) ("[T]he Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer."). As the Supreme Court later stated in Johnson v. Texas, 509 U.S. 350 (1993), "Lockett and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence," id. at 361.

Morris was in no way prevented from presenting to both the judge and jury evidence of his past drug use as potential mitigating evidence, and the Florida

Supreme Court made a factual finding that the trial court <u>did</u> consider that evidence. <u>Morris I</u>, 811 So. 2d at 667. For us to grant relief on this claim, Morris would have to provide clear and convincing evidence rebutting the Florida Supreme Court's unambiguous factual finding that "the trial court did find and weigh the prior history of drug abuse and addiction." <u>Id.</u>; <u>see</u> 28 U.S.C. § 2254(e). In addition, the district court made its own factual finding that "[t]his Court's review of the record demonstrates that the trial court considered and weighed Morris' prior history of drug abuse and addiction, but gave the mitigating factor little weight." 2009 WL 3170497, at *29. This factual finding is itself reviewed for clear error. <u>Spencer</u>, 609 F.3d at 1177.

Morris has not met his substantial burden of rebutting these factual findings. Indeed, Morris does not even argue that the state trial court failed to weigh the evidence. He says instead that "it is not clear how the court considered the nonstatutory mitigation. The court stated that the prior drug use in the past is not mitigating <u>yet the court weighed the mitigation giving it little weight</u>." Morris seems to argue that the state trial court's confusing language itself amounted to constitutional error, because it "contributed to the court's finding that the mitigation [was] entitled to little weight." Thus, Morris concedes that the trial court did consider and weigh his past drug use as mitigating evidence, but makes

30

the pained argument that the "trial court went into the analysis with the preconceived notion that the drug use was not mitigation." When a trial court considers mitigating evidence during sentencing, as the trial court did here with respect to Morris's past drug use, there simply is no constitutional error of the kind Morris now urges us to recognize. See Harris, 513 U.S. at 512; Blystone, 494 U.S. at 307-08; Atkins, 965 F.2d at 962. Accordingly, the Florida Supreme Court's decision denying relief on this claim was not contrary to or an unreasonable application of clearly established federal law.

**D.**

Finally, Morris claims that cumulative trial court errors deprived him of his Sixth Amendment right to a fair trial. "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) (internal quotation marks omitted). We address claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that we find in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial. See United States v. Calderon, 127 F.3d 1314, 1333 (11th Cir. 1997).

Plainly, Morris's cumulative error claim must fail. As demonstrated above, none of Morris's individual claims of error or prejudice have any merit, and therefore we have nothing to accumulate. This Court has made clear that where "[t]here [is] no error in any of the [trial] court's rulings, the argument that cumulative trial error requires that this Court reverse [the defendant's] convictions is without merit." United States v. Taylor, 417 F.3d 1176, 1182 (11th Cir. 2005); see also United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004); United States v. Barshov, 733 F.2d 842, 852 (11th Cir. 1984).[3]

Because Morris is not entitled to habeas relief on any of the claims raised on appeal, we affirm the judgment of the district court and deny Morris's petition for

---

[3] Citing two decisions from one of our sister circuits, the State further argues that, in the absence of Supreme Court precedent speaking to the issue of cumulative error claims in federal habeas, Morris's cumulative error claim does not even present a cognizable claim upon which habeas relief may be granted under AEDPA. See Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006) ("[C]umulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue."); Lorraine v. Coyle, 291 F.3d 416, 447 (6th Cir. 2002), amended on other grounds, 307 F.3d 459 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."). But see Parle v. Runnels, 505 F.3d 922, 928-29 (9th Cir. 2007) (recognizing claims of cumulative error in federal habeas, stating that "the Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal" (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Chambers v. Mississippi, 410 U.S. 284, 290 n.3, 298, 302-03 (1973))). We need not determine today whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law. For our purposes, it is enough to say that Morris's cumulative error claim clearly fails in light of the absence of any individual errors to accumulate.

32

relief.

**AFFIRMED.**